**Commonwealth v. Anderson**

C.P. of Jefferson County, no. CP-33-CR-438-2006.

*LaVieta Lerch,* for Commonwealth.
*Christopher E. Mohney,* for defendant.

FORADORA, *P.J.,* February 7, 2007—

## PROCEDURAL HISTORY

The defendant, Richard Lee Anderson, was arrested on May 6, 2006. By formal information filed August 1, 2006, he was charged with driving under the influence— 75 Pa.C.S. §3802(a)(1)—and three traffic-related summary offenses. Anderson waived his preliminary hearing, and on December 7, 2006, he filed an omnibus pretrial motion consisting of two motions to suppress and a motion to quash information. On January 26, 2007, the court

held a hearing at which the Commonwealth offered as evidence the testimony of Patrolman Paul N. Brosky of the Brockway Borough Police Department. No other witnesses testified.

## FACTUAL HISTORY

Brosky testified that while traveling north on SR 119 in Brockway, he noticed a vehicle coming toward him and straddled halfway between both drivers' lanes. He watched as the vehicle moved back to the right, overshooting its own lane and nearly hitting a bridge with its front end. Brosky also observed that the vehicle was traveling at an excessive rate of speed. Brosky said that he turned around at that point and proceeded to pursue the vehicle. He said that he could still see the vehicle's taillights in the distance and activated his emergency lights while both vehicles were still within the borough limits. According to Brosky, however, the driver, whom he later identified as Anderson, failed to notice them and pull over until they were 200 or 300 yards beyond the Borough line and into Snyder Township. Brosky averred that there were no other vehicles between his car and Anderson's.

Brosky further testified that when he approached Anderson, he immediately smelled a strong odor of alcohol emanating from the vehicle. Brosky then requested Anderson's driver's license and returned to his vehicle where, for safety reasons, he called for backup while verifying Anderson's identity. After backup arrived, continued Brosky, he asked Anderson whether he had been drinking, to which Anderson replied that he had consumed a couple of drinks. Brosky did not question

him further but decided to conduct four field sobriety tests, which he concluded Anderson failed.[1] Brosky subsequently arrested Anderson, read him his *Miranda* warnings, and transported him to DuBois Regional Medical Center.

After reaching the hospital, said Brosky, Anderson was asked to submit to a chemical blood test and told that he had the option of consenting or refusing. According to Brosky, Anderson refused the blood draw. Brosky testified that he had read the DL-26 form to Anderson word-for-word despite Anderson's multiple assurances that the reading was unnecessary. Brosky said that he also explained the form in layman's terms and informed Anderson that if he refused the blood test, he would be charged with DUI, anyway, and could receive the maximum penalties plus a one-year license suspension if found guilty. Anderson responded that he had refused a blood draw before without adverse consequence and would not give blood this time, either. Brosky then had Anderson sign the DL-26 form, transported him to his home, and filed charges.

## DISCUSSION

### Reasonable Suspicion To Stop

In his motion to suppress evidence, Anderson raises two issues, one of which is the reasonableness of the

---

1. When asked to say his ABCs, said Brosky, Anderson proceeded in a sing-song and could not recite them accurately. Nor could he correctly count forward from one to four and backward from four to one while touching each of his fingers with his thumb. He was also unable to take seven steps, heel-to-toe, in a straight line. Finally, on a preliminary breath test, Anderson registered a .15, which is the highest reading the machine will give.

stop. He maintains that Brosky was without reasonable suspicion to believe that he had committed a traffic violation.

Under 75 Pa.C.S. §6308(b), an officer need only have reasonable suspicion to believe that the Vehicle Code has been violated in order to make a lawful stop. According to *Commonwealth v. Hamilton,* 543 Pa. 612, 673 A.2d 915 (1996), that means that a police officer may stop a vehicle if he has "articulable and reasonable grounds to suspect that a violation of the Vehicle Code ha[s] occurred." *Id.* at 618, 673 A.2d at 918 (citing *Commonwealth v. Whitmyer,* 542 Pa. 545, 552, 668 A.2d 1113, 1116-17 (1995)). Under the Vehicle Code, that standard applies when the officer has articulable and reasonable grounds to suspect that a driver is operating his vehicle in the wrong lane of traffic.

According to section 3301(a), a driver having sufficient road width to do so must keep his vehicle within the right half of the roadway upon which he is traveling, *id.;*[2] section 3307(b) specifies that no driver shall at any time drive on the left-hand side of the road where the markings thereon signify a no-passing zone, *id.;* and section 3309(1) directs that whenever a roadway has been divided into two or more lanes, a driver shall, as nearly as practicable, drive entirely within a single lane. *Id.*

Anderson failed to keep his vehicle within the confines of his own lane and offered no evidence tending to establish that he was unable to do so. Brosky watched him

---

2. Five exceptions apply to this general rule, but none is applicable in this case.

driving in the middle of two lanes divided by a centerline and one of which was designated for oncoming traffic. He also observed Anderson veering beyond his own lane while attempting to correct his position, nearly colliding with a bridge guiderail in the process. Brosky then confirmed that Anderson was speeding after he turned around and began his pursuit. These circumstances lead inexorably to the conclusion that Brosky did indeed possess reasonable suspicion to believe that Anderson had violated provisions of the Vehicle Code.

### Jurisdiction to Stop

Also in his motion to suppress evidence, Anderson argues that Brosky conducted an improper, illegal, and unjustifiable stop because it was executed outside of his primary jurisdiction and without statutory authority.

The Municipal Police Jurisdiction Act (MPJA)—42 Pa.C.S. §8951 et seq.—states in relevant part that any duly employed police officer within the Commonwealth has authority to perform police functions outside of his primary jurisdiction *"[w]here the officer is in hot pursuit of any person for any offense which was committed,* or which he has probable cause to believe was committed, within his primary jurisdiction and for which offense the officer continues in fresh pursuit of the person after the commission of the offense." Section 8953(a)(2). (emphasis added)

Anderson focuses on the DUI and argues that Brosky did not have probable cause until after the stop to believe that a DUI or other misdemeanor or felony had been committed. Neither the MPJA nor interpreting case law

requires that the offense be a felony or misdemeanor, however. The statute itself says that jurisdiction attaches when the officer is in fresh pursuit "for any offense" committed within his jurisdiction. *Id.* By definition, "any offense" includes summary offenses, and the MPJA makes no effort to foster a different understanding.

*Commonwealth v. McGrady,* 454 Pa. Super. 444, 685 A.2d 1008 (1996), confirms the scope of offenses covered by the MPJA. In circumstances similar to those present here, the officer in *McGrady* pursued and stopped the defendant outside of his primary jurisdiction for the purpose of issuing a traffic citation after witnessing the defendant cross the centerline. *Id.* at 446, 685 A.2d at 1008-1009. The officer could not stop him sooner due to unsafe road conditions. *Id.* at 446, 685 A.2d at 1009. The defendant was ultimately charged with a DUI as a result of the encounter. *Id.*

Reversing a suppression order granted by the trial court, *McGrady* affirmed the arrest under the MPJA, noting that the officer had observed the defendant committing a summary traffic violation and thus could have stopped him immediately to issue a citation. *Id.* at 450, 685 A.2d at 1010. The only reason the officer waited, said the court, was because of the unsafe road conditions. *Id.* at 450, 685 A.2d at 1010-11. The court concluded that because the officer had personally witnessed the offense, he was permitted by the MPJA to continue his "fresh pursuit" of the defendant to issue the citation. *Id.* at 450, 685 A.2d at 1011.

The immediate scenario is practically indistinguishable. Brosky personally observed Anderson committing

two separate traffic violations—crossing the centerline and driving at a speed in excess of the posted speed limit. He immediately turned around to pursue the vehicle, and the only reason he did not detain Anderson within the borough limits was because Anderson's speed prevented Brosky from catching up to his car until they were already in Snyder Township. Brosky's was unquestionably a fresh pursuit, however. At no time did he discontinue the chase after making the prompt decision to pursue Anderson. See *Commonwealth v. McPeak*, 708 A.2d 1263, 1266 (Pa. Super. 1998) (articulating that the MPJA's hot and fresh pursuit exception requires only that the chase be immediate, continuous, and uninterrupted).

### *Refusal of Blood Test*

Anderson argues in his motion to suppress his refusal to submit to chemical testing that his refusal must be suppressed because the form that Brosky used—DL-26—was misleading, unfair, and a deficient warning of the consequences of refusal. He relies on *Commonwealth v. Jaggers,* 903 A.2d 33 (Pa. Super. 2006), wherein the court determined that the DL-26 warnings were insufficient to apprise defendants of the actual consequences of declining chemical testing. *Id.* at 35-37. *Jaggers* concluded that motorists should be afforded a more comprehensive warning of the ramifications of refusal in the event of a conviction. *Id.* at 37.

Later that year, our Supreme Court reached the opposite conclusion in *PennDOT v. Weaver,* 590 Pa. 188, 912 A.2d 259 (2006). Though not explicitly doing so,

*Weaver* effectively overruled *Jaggers* by eschewing the relevant premises upon which *Jaggers* relied.

License suspensions are often a civil consequence of criminal activity. Typically, the scope of review governing their appeal limits the reviewing court to determining whether the trial court's findings of fact were supported by competent evidence and whether the trial court had committed an error of law or abuse of discretion in reaching its decision. *Weaver,* 912 A.2d at 261. And because the standard of evidence sufficient to decide a civil appeal differs from the "beyond a reasonable doubt" standard governing criminal matters, judging a criminal matter by a civil standard would generally be inadvisable at best.

*Weaver,* however, did not apply the typical civil standard. Rather, the question was one of statutory interpretation—a question of law requiring plenary review, *id.,* and as interpreted by our Supreme Court, DL-26, which was the same version that Brosky employed in this case, satisfied the mandates of 75 Pa.C.S. §1547 and adequately notified motorists of the consequences of refusing to submit to chemical testing. *Weaver,* 912 A.2d at 264.

Quoting the relevant language of section 1547, the *Weaver* court determined that its plain language only required an officer to inform an arrestee that a refusal of chemical testing would result in additional penalties should he refuse to submit to chemical testing. *Id.* "[I]t does not require the officer to enumerate all of the possible penalties," it said. *Id.* Directly contradicting *Jaggers,* moreover, *Weaver* rejected the contention that

DL-26's reference to section 3804(c) was meaningless to most people. *Id.* The court concluded instead that "[f] orm DL-26 gives an arrestee an easily understandable warning that if he refuses a chemical test and is convicted of DUI, he will be subject to severe penalties because of his refusal." *Id.* The court further articulated that the language of DL-26, which was patterned after the legislative dictates of section 1547, was clear and did not include "the impractical complexity of explaining each of the three sections and 11 sub-subsections set forth in section 3804(c)." *Id.,* 912 A.2d at 264-65. See *Jaggers,* 903 A.2d at 36-37 (reaching the opposite conclusion).

Additionally, *Weaver* said that DL-26's clause, "which include a minimum of 72 hours in jail and a minimum fine of $1,000," was an accurate statement of the applicable minimum penalties and, by its language, apprised motorists with the word "include" that they were merely exemplary, not an exhaustive list of possible penalties. *Id.,* 912 A.2d at 265. See *Jaggers,* 903 A.2d at 37 (reaching the opposite conclusion). That interpretation, said the court, comported with the statute's plain language *and* the legislative intent. *Id.,* 912 A.2d at 264.

Under *Weaver,* then, Brosky's reading of DL-26 sufficed to inform Anderson of the possible repercussions of his refusal. Brosky read the form line by line, verified that Anderson understood the contents of the form, and obtained Anderson's signature at the bottom. According to *Weaver,* the form was legally sufficient, and because the issue in the decision surrounded interpretation of the statute, that *Weaver* was a license

suspension appeal does not affect its applicability to the present case.

## ORDER

And now, February 7, 2007 in accordance with the foregoing opinion, it is hereby ordered and decreed as follows:

(1) Defendant's motion to suppress evidence is denied.

(2) Defendant's motion to suppress refusal to submit to chemical testing is denied.

(3) Defendant's motion to quash information is denied.